# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### AUGUST SESSION, 1998

FILED

April 1, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 01C01-9801-CC-00007 |
| | ) | |
| Appellee, | ) | |
| | ) | RUTHERFORD COUNTY |
| V. | ) | |
| | ) | |
| | ) | HON. JAMES K. CLAYTON, JR., |
| RUDOLPH MUNN, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (FIRST DEGREE MURDER) |

FOR THE APPELLANT:                    FOR THE APPELLEE:

**J. STANLEY ROGERS**                  **JOHN KNOX WALKUP**
Attorney at Law                        Attorney General & Reporter

**CHRISTINA HENLEY DUNCAN**            **JOHN P. CAULEY**
Attorney at Law                        Assistant Attorney General
Rogers Richardson & Duncan             2nd Floor, Cordell Hull Building
100 North Spring Street                425 Fifth Avenue North
Manchester, TN  37355                  Nashville, TN  37243

**JOHN G. MITCHELL, JR.**              **WILLIAM C. WHITESELL, JR.**
Attorney at Law                        District Attorney General
P.O. Box 1336
Murfreesboro, TN  37130                **J. PAUL NEWMAN**
                                       Assistant District Attorney General
                                       Judicial Building Suite 303
                                       20 N. Public Square
                                       Murfreesboro, TN  37130

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

The Defendant, Rudolph (Rudy) Munn, appeals as of right his conviction of premeditated first degree murder in the Circuit Court of Rutherford County. The jury sentenced Defendant to life without the possibility of parole. In this appeal, Defendant raises the following twelve (12) issues:

I. Did the trial court err in denying Defendant's motion to suppress the video taped statements obtained in violation of his Fourth Amendment rights and in violation of federal and state wiretap laws;

II. Did the trial court err in denying Defendant's motion to suppress because Defendant was not properly advised of his <u>Miranda</u> rights and did not knowingly waive his <u>Miranda</u> rights prior to making the statements (Defendant's Issue III);

III. Did the trial court err in denying Defendant's motion to suppress because the statements were not voluntary (Defendant's Issue II);

IV. Did the trial court err in denying Defendant's motion to suppress because the statements were taken in violation of his Fifth Amendment right to counsel;

V. Did the trial court err in not suppressing Defendant's subsequent statements under the derivative evidence rule;

VI. Was there sufficient evidence to convict Defendant of first degree murder beyond a reasonable doubt;

VII. Did the trial court err in failing to declare a mistrial during the guilt phase of the trial;

VIII. Is the felony murder aggravating circumstance supported by the evidence;

IX. Did the trial court err in its charges to the jury during the sentencing phase of the trial:

A. Did the trial court err in charging the jury with aggravating circumstances (i)(6) and (i)(7);

B. Did the trial court err in failing to instruct the jury on the statutory definitions of theft and robbery;

C. Did the trial court err in not instructing the jury that Defendant had "no criminal record or conviction" as requested by Defendant;

D. Did the trial court err in not charging Tennessee Pattern Jury Instruction 43.03 during the sentencing phase of trial;

X. Did the trial court err in admitting certain testimony of Valerie Roscoe and Officer Peel;

XI. Did the trial court err in its responses/instructions to questions asked by the jury during deliberations; and

XII. Did the trial court err in allowing the jury to view the video tape of Defendant's confession during deliberations at the sentencing phase of the trial.

After a careful review of the record, we affirm the judgment of the trial court.

## Facts

The facts presented at trial reveal that on November 28, 1995, at approximately 6:13 p.m., the Murfreesboro Police Department received a call that the body of a white male had been found in the Days Inn parking lot on South Church Street in Murfreesboro, Tennessee. The police arrived a few minutes later and conducted a crime scene investigation during which they discovered the body was that of a white male with a wound to the head. A pocket knife with the blade open was located next to the body, and the front pockets of the victim's pants were

turned inside-out. The body was lying close to the back of a car that was being towed by a motor home. No wallet, keys, or other items of identification were found on the body, and no one at the scene knew the identity of the person. An investigation of the motel registry, motel rooms, and surrounding crime scene revealed no evidence regarding the victim's identity.

On November 29, 1995, a medical examination and autopsy were performed on the victim, but again no evidence was discovered which revealed his identity. The autopsy report did reveal that the victim had died as a result of a contact gunshot wound to the head with the bullet traversing the brain.

For the two days following the discovery of the body, the police continued their search for the identity of the victim. The police placed a picture of the victim in the media urging citizens to assist in identifying the victim. In response, the police received a call on November 30, 1995, from a person who thought the victim could possibly be Andrew Poklemba, a student at Middle Tennessee State University (MTSU).

In an attempt to verify this information, Officers Eddie Peel and Chris Guthrie, both of the Murfreesboro Police Department, along with several other officers, went to Andrew Poklemba's dormitory room on November 30, 1995. Shortly thereafter, Poklemba's roommate, the Defendant, arrived at the room. Defendant told the officers that he had not seen his roommate since about 3:45 p.m. Monday, November 27, 1995. Officer Peel asked Defendant if he had any pictures of Poklemba, and Defendant found two photographs which he gave to Officer Peel.

After looking at the photos, the officers knew that the victim was in fact Andrew Poklemba.

In order to gather further information about Poklemba and his death, the officers briefly interviewed Defendant in his dorm room. Defendant denied any personal knowledge of Poklemba's death or of any motive on anyone's part to murder Poklemba. Defendant did tell investigators that an unknown person came to see Poklemba on the Sunday proceeding his death. According to Defendant, the man who came to visit Poklemba had short hair and wore combat boots. Defendant gave the police an alibi for where he was on the evening Poklemba was killed. He claimed to have been with a friend named Dennis Bova on the evening of the murder. However, the police obtained phone records from Defendant's dorm room which indicated that Defendant was in his room that evening. Detectives Guthrie and Peel later located Poklemba's vehicle in the vicinity of Abernathy Hall, an MTSU campus dormitory.

On December 1, 1995, after conducting other interviews with people who also knew Poklemba, Officers Peel and Guthrie noticed several discrepancies in the details given to them by Defendant. These included knowledge that Defendant was not with his friend Dennis Bova on the evening of the murder as Defendant had previously told the officers. In fact, at this point the officers had obtained the phone records of Defendant's dorm room in determining his whereabouts on the night of the murder. The officers believed that Defendant had more information about Poklemba than he had told them the previous day. That afternoon, Officer Peel contacted Defendant at his parents' home in Manchester, Tennessee, and asked

him if he would assist them in the clarification of these details. Defendant voluntarily agreed to come to the police station to answer additional questions.

At approximately 5:00 p.m. on December 1, 1995, Defendant, his parents, and his two-year-old sister arrived at the police station. Officers Peel and Guthrie, Defendant, and his father, Ron Munn, then went to the third floor where they were escorted into the police station interview/interrogation room, with a sign, "Felony Booking Room," over the door. It was equipped with blinds on the windows, a small table, chairs, and an audio tape recorder on the table. Unbeknownst to Defendant, the room was permanently equipped with a video camera which was hidden in the clock on the wall. Microphones were in the ceiling above the table and chairs. The officers did not inform Defendant that the conversations were being recorded by a hidden video camera and microphones. In another room within the police department were several video cassette recorders and a monitor. The conversations in the Felony Booking Room could be monitored by other officers in the separate room while they were being recorded.

After the four men were seated, Officer Guthrie explained that he was turning on the tape recorder on the table. He also stated that no one was under arrest and said that Defendant could leave at anytime. Defendant's response indicated that he understood this. Both Officers Peel and Guthrie inquired about the discrepancies in Defendant's story, but Defendant generally stayed with his original story. About twenty minutes into the questioning, Officer Peel asked Defendant if he wanted a Coke, to which Defendant responded "yes." Officer Peel then left the room and returned with a Coke for him. At no time did Defendant state that he wanted to leave or that he wanted an attorney. At the conclusion of the 54-minute interview, Officer

Peel indicated that Defendant and his father were free to go and escorted them to the lobby where Defendant's mother, Rita Munn, and Defendant's little sister were waiting.

Officer Peel asked Mr. Munn to explain to his wife that Defendant might be asked to return to the station if more information was needed. Mrs. Munn was very upset and she asked Lieutenant Peel if he thought that Defendant had killed Poklemba. Lieutenant Peel responded, "Ask your son." Mrs. Munn did so and Defendant did not respond. Further conversation ensued among them. Officer Peel stated that he would like to talk to Defendant outside the presence of his parents because he felt that Defendant would come closer to telling the truth if they were not in the room. Rita Munn testified that Lieutenant Peel kept staring at her as if he wanted her to "get involved in the process," and that she felt that they were no longer free to leave at that time. Mrs. Munn then asked Defendant if he wanted to talk with the police further and he replied that he did. They all proceeded to the third floor and Officers Peel and Guthrie and Defendant went in the Felony Booking Room while Mr. and Mrs. Munn and the little sister waited outside in the hallway.

Again, Officer Peel started the cassette recorder on the table and told Defendant that he was not under arrest, that he had voluntarily come to the police station, and that he could leave at any time he wished. Defendant indicated that he understood. The officers told Defendant that they thought he knew more than he was telling them. Specifically, Officer Guthrie stated, "It's time to tell it [the truth]." Officer Peel then stated, "You know who killed him, don't you?" A few minutes into the interview, Officer Peel requested that Defendant provide him with a copy of his fingerprints. Defendant told them that he did not want to give his fingerprints that

-7-

night. Specifically, he said, "Could I come . . . do it next week when my parents aren't here? I'll call you and I can come down here." The officers then told Defendant that they had a witness who would say he saw Defendant and the victim arguing the day before the victim was killed. At one point during the interview, Defendant's contact popped out. Defendant asked the officers if a mirror was available. Although a bathroom was located just outside the Felony Booking Room, the officer told Defendant to pull the blind up on the window and use its reflection for a mirror. There is no indication that Defendant knew a bathroom was located just outside the interview room. At least three more times during this interview, the officers told Defendant that they knew he was not telling the truth and they urged him to tell all that he knew. Defendant again said he would rather come back on Monday and be fingerprinted. The officers told him, "Now's the time to do it [tell the truth], with momma and daddy here to support you and be with you." Officer Peel then told Defendant the following:

> I'm gonna tell you your momma's gonna ask me if I think
> you did it. And I'm gonna say momma yes I do. And you
> know what she's gonna do. She's gonna have a fit.

Again, Defendant stated that he would rather come back and talk to the officers later.

At this point, Rita Munn opened the door and came into the interview room. Mrs. Munn indicated that she had been listening outside the door and had heard what they were saying. She told the officers, "This sounds like the kind of thing ___ need ___ lawyer ___." (The blanks represent portions of the transcripts and tapes that are inaudible.) Officer Peel told her that "[a]ll you have to do is say you want one." Mrs. Munn asked the officers, "You're not intimidating him to tell you something?" Defendant then responded, "They're not. They're being nice."

Mrs. Munn began to plead with her son, in the presence of the officers, that he should explain what happened. The following is an excerpt of her emotional plea:

> You know that if we don't get it out in the open, the next stop is we'll go to a lawyer's office and we'll have to go through all this or he'll have to make you get it out in the open because sooner or later we'll have to all get it out in the open. Even if you went to confession. The first thing Father Kurt would say is tell me what happened. If you were to walk out of this b[uilding] and die tonight, that would be enough for certain if you lied to these men or avoid telling them something, then that would be enough to keep you out of heaven. Is this worth eternal damnation? Do you understand? Is this worth that? I don't think so. You can't go to communion and take the body of Christ and believe all that and not believe that he doesn't love you too, and won't forgive you. That's the first step. We can't take the first step until we know what you've done. We will not abandon you Rudy. We love you too much for that. Yeah. But please, this is like bleeding an open wound. Can we just get to the end of it? Please? Okay? Please?
>
> . . .
>
> They [the officers] think there's more, they think there's more. And you have ___ okay, let's just get to the end. I'll pray for you, okay? Okay? I'll help you. What happened?

Defendant responded by saying, "I told them what happened momma."

Officer Guthrie then admitted to Mrs. Munn that they thought Defendant killed the victim. Specifically, Officer Peel stated:

> I think that for whatever reason it was, he and Andrew. Went to this motel. Andrew was shot. Andrew's car was brought back and parked next to where your daughter's dorm is and left there. And whoever did it, walked on off. And the discrepancies in his story, that he's told, makes us believe that he was the one that done it. All I'm gonna do is what I'm gonna do.

Officer Peel then informed Mrs. Munn that her son had asked to come back on Monday to speak further with them.

Later in that interview, Officer Peel asked Rita Munn, "Do you want to talk to us or do you want to talk to him by himself?" Officer Peel then asked Defendant, "Do you want to talk to your momma? Or do you want to talk to us?" Moments later, Officer Guthrie asked Defendant again, "Do you want to talk to your momma by yourself?" Defendant responded, "Yeah." Defendant did not *specifically* ask to leave or to consult with an attorney at any time. Both officers left the room. The door to the Felony Booking Room was then closed but not locked. Throughout the interview there had been the distant sounds of people outside the door, as evidenced in the video tapes. Officer Peel went into the hall area and Officer Guthrie went in and out of the separate video monitoring room.

Mrs. Munn sat close to Defendant, touched him on his knee, and pleaded with him to tell the officers what they wanted to know. Defendant then told his mother, "I shot him." Defendant proceeded to tell his mother that he shot the victim "[F]or the money. I told him I was gonna pay him late. I borrowed his gun and sold it, and I shot him. Didn't have any intention of paying the money." At one point, Defendant provides the following detailed statement to his mother:

> Well, we had to go somewhere else. I told him we were going to go ___ and meet somebody but he ___ the license plates on the car, so if we did get caught it would be hard to find when we did that, when he knelt down to unscrew the license plate. Then I shot him in the back of his head. He fell down and I rolled him over and took his license and wallet.

Mrs. Munn asked Defendant why he changed the license plates on the car and Defendant responded, "hard to find me."

Defendant goes on to tell his mother the following:

> I didn't like the kid from the very beginning. I hated him with a passion and ___ was the first time. I couldn't stand the kid. He used to pick on me because I wasn't as smart as he was. I hated him. I couldn't stand him. He disgusted me. He had pornographic magazines in the room, it was disgusting.

Mrs. Munn testified that she thought she and Defendant were alone and that no one was listening or recording their conversations. Defendant asked his mother to "Go find the police so I can tell them." Mrs. Munn told Defendant to "[s]tay right here [in the interrogation room]."

Mrs. Munn then went and found Officer Peel and asked him to accompany her inside the Felony Booking Room where she expressed her confusion about what she should do. Defendant then stated to his mother, "Why don't you go ahead and tell them?" Mrs. Munn then stated, "He says he shot [the victim]." Defendant interjected, ".22 caliber, is that what you found?" Officer Peel asked if Defendant wanted to tell them about it and Defendant said, "Don't turn on the tape, I would rather not tape it." Following this exchange, Mrs. Munn asked, "Don't we have to have a lawyer?" Officer Peel stated "If you want one, it's up to you, just whatever you want to do." Defendant did not ask for an attorney nor did he ask to leave the room. Mrs. Munn expressed a desire to talk with her husband and later asked to speak with Officer Peel alone. Mrs. Munn and Officer Peel exited the room leaving Officer Guthrie and Defendant alone.

Later, Defendant's father and his two-year-old sister entered the interview room. In the presence of Officer Guthrie, the following conversation occurred between Defendant and his father:

Ron Munn: You shot him?

Defendant: Yes.

Ron Munn: Why'd you do it?

Defendant: For money.

Ron Munn: For what?

Defendant: For money. I hate it that I had to ask you for money, never enough.

Ron Munn: Rudy.

Defendant: Plus, I hated the kid -- he was a jack-ass.

Ron Munn: Rudy.

After that exchange, Officer Guthrie exited the interview room, leaving Defendant, his father, and his sister in the room. Defendant and his father continued to discuss the facts which motivated his actions. Specifically, Defendant told his father that he killed the victim for a total amount of $800-900 dollars.

Later, Rita Munn reentered the room and Ron Munn asked his wife, "He did it?" Rita Munn said, "That's what he said." A few minutes later, Rita Munn asked her husband, "Was it an accident?" Defendant responded with the following:

It was intentional. I did it on purpose. I knew exactly what I was gonna to do. I knew what to take to take his identification. I wish I could have put his car somewhere else but Abernathy was the farthest away from Sharp that there was, that I could think of, without having to walk too far. That's why I put it over there.

Rita Munn then asked, "Now what do we do? How come you are not crying? How come you don't feel awful about what you did?" Defendant replied, "Because I am a psychopath, in my opinion." Defendant went on to say, "I know what I did. I know it was wrong. There is nothing I can do to change that. ___ cry is not going to

-12-

change it. I have to accept responsibility, I'm not gonna sit and cry." The officers were not present during any of the above conversation.

Following that exchange, Officer Peel reentered the room. The officer spoke briefly with Mrs. Munn and Defendant. Mrs. Munn then told Officer Peel that "[h]e [Defendant] should have a lawyer." Officer Peel stated, "If he wanted one," and then quickly changed the subject and left the room.

In the final interview, Officers Peel and Guthrie were with Defendant. At one point, Officer Peel asked Defendant, "Feel better?" Defendant responded, "Yeah." The officers spoke to Defendant about being an adult and having to make up his own mind. Defendant then asked Officer Peel to run down what would happen to him. Officer Peel told Defendant that the District Attorney was on the way and that he said "yea or nay." Defendant then asked, "What do you mean yea or nay?" Officer Peel responded, "On what to do. We are not trying to rush you. He says whether to charge you tonight or what to do or let you go home tonight and charge you later or what." Defendant told the officers, "[I]t was all about the gun and money, it's always been about money." At this point, Officer Peel pushed a copy of the Miranda warnings in front of Defendant and asked, "Have you read that?" Defendant then looked at the written Miranda warning and told them "No." Officer Peel then stated, "Why don't you go ahead and read that just to be safe?" Defendant read the warning for approximately 15-25 seconds, and Officer Peel stated, "Know what you want to do yet?" Defendant stated, "I'm going to wait and see what happens ___ I don't want to sign anything." Officer Guthrie then said, "You understand it?" Defendant responded, "Yeah."

At one point, Officer Peel said, "Reckon we can find the billfold," to which Defendant replied, "I can help you find it, the keys too." Defendant then initiated several topics of discussion relating to the crime. These discussions were not in response to police questioning, but appeared simply to be an attempt by Defendant to determine how much the police actually knew. Later, Defendant's father entered the interview room and the following exchange occurred.

> Ron Munn: Where's he going from here?
>
> Officer Peel: Well we ain't started. We'll have to wait and see, what y'all said, momma told us to wait until she comes back.
>
> Defendant: [G]et a lawyer, that would probably be the best thing, ___ get lawyer. Y'all said I wasn't under arrest so I could leave tonight and I could just . . . .
>
> Officer Peel: You're going to be arrested tonight.

There was then a discussion about waiting for a lawyer and the Munns were told that the District Attorney was on the way. The whole Munn family and both officers were present in the room at this time. Rita Munn asked her son, "Rudy, are you sorry?" Defendant responded, "Not really. He was a dirty little son-of-a-bitch, looked at porno magazines." Moments later, the Munns were told that the District Attorney was there and they were asked if they wished to talk with him. Defendant was subsequently arrested and booked that evening.

Defendant was interviewed in the Felony Booking Room for a total of 3½ - 4 hours. Defendant's motion to suppress the secretly-taped statements made to his mother and father while in the Felony Booking Room was denied by the trial court, and the video tapes were admitted into evidence at trial. Written transcripts of the tapes were prepared by both parties, but they were never given to the jury. The

video tapes contained blank portions or "skips" where the parties could not agree as to what was being said. The judge told the jury the following in regards to the tapes:

> [Y]ou've heard and viewed a videotape and have been advised that certain portions of the videotape have been deleted. Now, you are specifically instructed that you are not to speculate on these deletions and that these deletions contain material that is irrelevant and immaterial to your decision in this case.
>
> In addition, you've been advised that the State and the Defendant disagree as to what some of the statements on the videotape might have been. You are the exclusive judges of the statements on the videotape or of what statement the videotape contains, just as you are the exclusive judges of all of the facts and evidence in this case.

Valerie Roscoe, the victim's fiancee, testified at trial that she met Poklemba approximately a year before his death. She and the victim became romantically involved in the summer of 1995 and Poklemba spent most of his time with Ms. Roscoe at her home in Nashville. In fact, she was introduced to Defendant only weeks before Poklemba was murdered.

She testified that Poklemba was an ROTC student at MTSU and had served in Panama and in Saudi Arabia. According to Ms. Roscoe, Poklemba owned several military type weapons, including a 9mm, a CAR-15, an AK-47, a M-16 and other guns. He kept these guns at his dorm room. She testified that Poklemba had given her the CAR-15, and had loaned Defendant the AK-47. She said Poklemba had been trying to get the gun back from Defendant.

Ms. Roscoe also testified that on the weekend before his death, she and Poklemba had traveled to Washington D.C. to meet members of Poklemba's family. Ms. Roscoe said that upon their return to Tennessee, on Monday, November 27,

1995, she and Poklemba went to the Embassy Suites Motel to make plans for their wedding. The last thing Ms. Roscoe recalled was that Poklemba said he was going to return to Murfreesboro to see Defendant.

Paul Reavis, a student at MTSU and a friend of Defendant's, testified that Defendant offered to sell him an AR-15, and Reavis gave Defendant $200-$250 dollars toward the total purchase price of $500. Reavis eventually returned the AR-15 to Defendant because threads in the gun were stripped. Defendant then loaned him an AK-47. Reavis testified that sometime on the afternoon of November 27, 1995, Defendant had asked to borrow a small caliber handgun from Reavis. The two of them did not discuss why Defendant wanted the gun. Reavis drove from MTSU to his home in Hillsborough, Tennessee, in order to retrieve the weapon for Defendant. He recalled that he gave the weapon to Defendant at approximately 2:00 p.m. that afternoon. Reavis also let Defendant borrow a box of .22 long rifle bullets. Reavis testified that he told Defendant that the weapon was a single-action pistol. That meant that in order to fire the weapon, the hammer had to be cocked. In other words, the pistol could not be fired simply by pulling the trigger. Defendant returned the pistol to Reavis that same evening at approximately 7:30 p.m. Reavis testified that some of the bullets were missing and there were indications that the gun had been fired. Again, they did not discuss the reason Defendant had needed the gun. Two days after the murder, Defendant gave Reavis a duffle bag with "[v]arious military surplus type of things and web gear" in it, such as rifle magazines, a bayonet, a knife, two magazine pouches, and a pistol belt.

Tommy Heflin, a forensic scientist at the Tennessee Bureau of Investigation crime lab, testified that "in order for the hammer to engage the firing pin [of the gun

-16-

in question], a transfer bar safety must come up and engage the hammer. And the only way you can do this is actually by applying pressure to this trigger area." He further testified that the transfer bar safety is "designed to keep a person from accidentally discharging the weapon."

Jason Dowdy, a student at MTSU, testified that he lived on the same dorm floor as Defendant. He said that he loaned Defendant a "silver knife, kind of like a Swiss Army knife" two-three weeks before Poklemba's murder for the purpose of taking down bulletin boards in their dorm hallway. Defendant stated at the police station that the victim had subsequently asked to borrow that knife from him and that Defendant no longer had it.

Robert S. Morrison testified that he saw Andrew Poklemba at approximately 6:00 p.m. on November 27, 1995, at the "Game Master Hobby Shop" in Murfreesboro. Keith Kail, the owner of the shop, also recalled seeing Poklemba at the hobby shop that evening. Morrison recalled hearing Poklemba say that his roommate was coming to pick him up. When a medium-size or small-size two-door car pulled up in front of the shop, Morrison asked Poklemba, "[i]s that your roommate" to which Poklemba replied, "[y]es, that's him." As Poklemba was walking out the door to get in the car, he told Morrison that he was going to the Day's Inn. This was at approximately 6:00 p.m.

At 6:13 p.m., police were notified of a body in the parking lot at the Day's Inn. According to witnesses, Poklemba was lying face down on the pavement with a hooded parka or jacket hood over his head. One of those witnesses, William Nix, pulled back the hood of the jacket in order to check Poklemba for a pulse. When he

didn't find a pulse, he asked another witness to get the police. Mr. Nix waited with the body until the police arrived. Mr. Nix also recalled that there was a silver military style pocket knife laying next to the body.

The medical examiner, Dr. Charles Harlan, found that Poklemba died from a contact gunshot wound to the back of his head. The jacket hood did not have a bullet hole in it.

During the sentencing phase, Defendant offered the testimony of his father, an older sister named Margaret, an older brother named Matthew, a family friend and former teacher of Defendant's named Ray Bouldin, a family friend and former neighbor of the Munns named Abby Stokes, the family pediatrician named Dr. Jerry Campbell, and a friend and fellow church member, Tony Graff. According to these witnesses, Defendant was born on April 24, 1977, and was the third of the ten children of Ron and Rita Munn. His father, Ron Munn, is a senior engineer with Corporate Technology as an operating contractor at the Arnold Engineering Development Center. Defendant was raised in Manchester and was a member of the Catholic church which he attended regularly. Defendant had done volunteer work in a nursing home, was active in the Boy Scouts, and played soccer. He made good grades in high school, was well-known, well-liked and came from a good family.

At the time of Poklemba's murder, Defendant was in his third month of college. On November 6, 1995, Defendant had completed a written application requesting to change rooms because he was not comfortable with Poklemba as his roommate. Defendant was never known to have been in trouble prior to this incident. During his

release on bond, Defendant lived with his family and helped his mother with her catering business.

## I.  Fourth Amendment, 18 U.S.C. § 2510 et seq.,
## and Tenn. Code Ann. § 40-6-301 et seq.

In his first issue, Defendant claims that certain of his videotaped statements should have been suppressed because they were taped in violation of his Fourth Amendment rights and in violation of federal and state statutes regarding wiretapping and electronic surveillance.  See 18 U.S.C. § 2510 et seq.; Tenn. Code Ann. § 40-6-301 et seq.

When an issue involving the suppression of evidence is presented for review, the appellate court must afford the findings of fact made by the trial court the weight of a jury verdict.  State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Makoka, 885 S.W.2d 366, 371-72 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 1994). In addition, "the party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence."  Odom, 928 S.W.2d at 23.  Consequently, an appellate court must affirm the judgment of the trial court unless evidence contained in the record preponderates against the findings of fact made by the court or a rule of law has been erroneously applied. Id.; Makoka, 885 S.W.2d at 371-72.  In evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, this Court may consider the proof adduced both at the suppression hearing and at trial.  State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

A. Fourth Amendment

As to his Fourth Amendment claim, Defendant asserts that he had a reasonable expectation of privacy while seated in the police interrogation room. Specifically, Defendant claims that the statements made to his mother and father while they were "alone" in the booking room should be suppressed because they were led to believe that they were carrying on private conversations.

The Fourth Amendment provides:

> Unreasonable searches and seizures. -- The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Under the Fourth Amendment, it is generally recognized that the application of the constitutional limitations upon governmental intrusion into an individual's matters or activities, i.e., whether or not a search occurs, depends upon whether or not the individual has a reasonable expectation of privacy relative to those matters or activities. See California v. Ciraolo, 476 U.S. 207, 211, 106 S. Ct. 1809, 1811, 90 L. Ed. 2d 210 (1986); United States v. Jacobsen, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656, 80 L. Ed. 2d 85 (1984); Katz v. United States, 389 U.S. 347, 360, 88 S. Ct. 507, 516, 19 L. Ed. 2d 576 (1967) (Harlan, J. concurring); State v. Roode, 643 S.W.2d 651, 652-53 (Tenn. 1982). These cases reflect that in determining what is a constitutionally protected reasonable expectation of privacy, a two-part inquiry is made: (1) has the person manifested a subjective expectation of privacy in the object of the challenged intrusion and (2) is society willing to recognize that expectation as reasonable or justified. See also State v. Bowling, 867 S.W.2d 338, 341 (Tenn. Crim.

App. 1993). Pointing out that the Fourth Amendment was meant to protect people and not places, the United States Supreme Court expressed in Katz that what a person seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576. Where the government violates an expectation of privacy which is both subjectively and reasonably entertained, evidence obtained thereby is not admissible in a criminal prosecution. Id. at 361, 88 S. Ct. 507, 19 L. Ed. 2d 576.

In this case, Defendant was required to establish both that he expected his conversations with his mother and father to be private and that such expectation was objectively reasonable or justified. As to the first requirement, the trial court made no specific finding of facts about Defendant's subjective expectation of privacy as to his conversation with his parents. Therefore, due to the lack of factual findings concerning this issue, we must employ a de novo standard of review. See State v. Dougherty, 930 S.W.2d 85, 86 (Tenn. Crim. App. 1996). After a careful review of the video tape and the testimony presented, we conclude that Defendant did in fact have a subjective expectation of privacy.

The State argues that by Defendant and his mother leaning in close to each other and speaking in more hushed tones than when others were present indicates that they did not expect their conversation to be private. However, we believe that Defendant and his mother expected just the opposite. First, Defendant had previously asked for the officer to turn off the audio cassette recorder that was visibly located on the table in the interrogation room, thereby leading him to believe that his statements were no longer being taped. Second, the officer invited Mrs. Munn to speak with her son "by himself." That specific phrase was repeated two additional

-21-

times. Officer Guthrie then asked Defendant if he wanted to "talk to your momma by yourself?" When Defendant said that he would, Officer Guthrie moved a chair next to Defendant for Mrs. Munn, and then both officers left the room and shut the door behind them. This likely could have led Defendant to believe that he and his mother would be talking privately with one another. Third, the very nature of the conversation, a son confessing to his mother that he killed another human being, is certainly an emotional moment between a mother and her son. After watching this videotaped conversation, we believe the closeness in proximity between Defendant and his mother was a natural response under the circumstances. Detective Guthrie even testified at the suppression hearing that he found the mother's actions to be "supportive." Furthermore, it was the officer who placed the chair so close to the Defendant, not Mrs. Munn. Also, although they may not have been speaking quite as loudly as when the officers were in the room, Defendant and his mother were certainly not whispering so low as to lead us to believe that they thought they were being secretly monitored. Based on all the above reasons, we find that Defendant did in fact have a subjective expectation of privacy in his conversation with his mother. Likewise, although the officers did not specifically say again that Defendant and his father could talk "alone," Defendant's expectation that the conversations in that room were private certainly carries over to his later conversations with his father in that same room.

We must next analyze the second prong as to whether the expectation was objectively reasonable. Thus, the question becomes, whether this expectation, viewed objectively, was reasonable and justifiable? This Court's inquiry into reasonableness asks "whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of

privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society." United States v. Hendrickson, 940 F.2d 320, 322 (8th Cir.), cert. denied, 502 U.S. 992, 112 S. Ct. 610, 116 L. Ed. 2d 633 (1991) (citations omitted). Based upon the facts of this case, we find that Defendant did not have a justified and reasonable expectation of privacy.

It is well-settled law in this State that a person does not have an expectation of privacy in a jail cell, State v. Dulswoth, 781 S.W.2d 277, 284 (Tenn. 1989), on a jail house telephone, State v. Leonard D. Hutchison, C.C.A. No. 1028, Knox County (Tenn. Crim. App., July 23, 1987), or in the back of a police cruiser, State v. Tilson, 929 S.W.2d 380 (Tenn. Crim. App. 1996). The United States Supreme Court has held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell . . . [t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." Hudson v. Palmer, 468 U.S. 517, 526, 104 S. Ct. 3194, 3200, 82 L. Ed. 2d 393 (1984). Likewise it follows that there is no expectation of privacy on a jail house telephone since "it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room," and it is not the equivalent of a man's house, within constitutional protection, nor is it a place where he can claim constitutional immunity from search or seizure of his person, papers, or effects. Lanza v. New York, 370 U.S. 139, 143-44, 82 S. Ct. 1218, 1220-21, 8 L. Ed. 384 (1962). Again, courts have held that no reasonable expectation of privacy exists in the back seat area of a police car as it has been argued that the back seat of a police car is equivalent to a jail cell. See United States v. McKinnon, 985 F.2d 525, 527-28 (11th Cir. 1993). Because the facts of the case before us involve

circumstances which differ somewhat from the above-mentioned cases, we analyze the issue with these cases in mind, while looking to other jurisdictions for guidance as well.

In State v. Wilkins, 868 P.2d 1231 (Idaho 1994), the arrestee-defendant told the police officer interrogating him that he would like to be alone with his parents. He then asked the officer to turn off the tape recorder that had been used during the interrogation. The officer turned off the tape recorder and left the booking room so defendant could speak with his parents. However, the emergency dispatcher for the city heard and recorded the conversation over an intercom system. The conversation between the defendant and his parents was admitted into evidence. In denying his motion to suppress, the trial court noted that "the dispatcher, who recorded the conversation between the defendant and his parents, testified that she listened to conversations in the police booking room regularly for the purpose of police safety." Id. at 1237. The dispatcher had testified that whenever someone was booked, that the monitoring was used as a safety feature in case something happened and someone needed help. The trial court stated that "the need . . . to have a safe and secure police station outweighs any expectation of privacy the defendant could possibly maintain in this particular setting." Id. at 1238. The Idaho Supreme Court agreed with the trial court and ruled that although the defendant had a subjective expectation of privacy, it was not a reasonable expectation of privacy. The supreme court held that "[i]t would be contrary to the governmental interest in maintaining security and order in facilities where those accused or convicted of crime are detained or incarcerated to allow an individual defendant to curtail electronic surveillance of visiting areas by requesting privacy." Id. It went on to say that "[g]iven the necessity of this surveillance, the fact that the police officer in this case

turned off the tape recorder and left the booking room at [defendant's] request is not sufficient to establish an objectively reasonable and justifiable expectation of privacy in [defendant's] conversation with his parents." Id.

In State v. Calhoun, 479 So. 2d 241 (Fla. Dist. Ct. App. 1985), the trial court held that the incarcerated defendant did have a reasonable expectation that his conversation with his brother in a police interrogation room was secure and private because such an expectation was deliberately fostered by the police officers and because Defendant had previously expressly invoked his Fifth and Sixth amendment rights. One of the officers testified that the conversation was monitored "for investigative purposes, not just for security." The appellate court affirmed the decision, but in a concurring opinion, the judge stated "[h]ad the suspect in this case not exercised his rights to remain silent and to request counsel, the videotape would have been lawfully obtained evidence." Id. at 245-46.

In State v. Hauss, 688 P.2d 1051 (Ariz. Ct. App. 1984), the arrestee-defendant told the police that he would discuss the crimes with them if they would first let him speak with his girlfriend. The officer told the girlfriend that the room was being monitored and she replied either "OK" or "All right." Both of the officers involved testified they were concerned with the passing of a weapon, the discussion of possible escape plans, plans to destroy evidence, and even the girlfriend's involvement in the crimes. The police had hoped the defendant would discuss the case after talking with his girlfriend as he said he would. However, the defendant confessed these crimes to his girlfriend and these tapes were admitted into evidence. The police did not expect that he would confess his involvement in these crimes to his girlfriend. The court held that any expectation of privacy defendant had

-25-

was outweighed by the need to maintain security. Id. at 1055. Also, the court mentioned the fact that the girlfriend had at least impliedly consented to the taping.

In United States v. Hearst, 563 F.2d 1331 (9th Cir. 1977), cert. denied, 435 U.S. 1000, 98 S. Ct. 1656, 56 L. Ed. 2d 90 (1978), the court held that the taped conversation between defendant and a childhood friend which was monitored and recorded by jail officials was properly admitted, as the intrusion by jail officials, pursuant to established jail policy, did not violate the Fourth Amendment. Also, there was no violation of defendant's Sixth Amendment right to assistance of counsel as there was no interrogation of defendant, either formally or surreptitiously, by the government during the conversation with his friend.

In the case sub judice, we do not believe the trial court erred in denying Defendant's motion to suppress the statements made to his mother and his father. Although we do not necessarily condone the surreptitious manner in which the police video taped Defendant in this case, we cannot, as a matter of law, say that those actions violated Defendant's Fourth Amendment rights. Officer Peel testified that the hidden video camera is used in "[m]ajor felony interviews, major investigations. And now mostly just about all the time with any investigation since we've got it operative." Although we can find no testimony that the hidden camera is used for safety purposes as was established in the cases cited above, we can say that this has obviously become ordinary, police station procedure at this particular police station. Although Defendant was not under arrest at the time he made the statements, as again distinguished from the cases cited above, case law does not distinguish between pre-arrest and post-arrest statements for purposes of analyzing the

reasonableness of a defendant's expectation of privacy.  See McKinnon, 985 F.2d at 528.

We do not hold that a defendant's statements obtained through the surreptitious taping in a police station interview room will always be admissible. However, under the facts of this case, we hold that although Defendant had a subjective expectation of privacy, he did not have a legitimate or reasonable expectation of privacy.  We note that had the conversations been of a legally recognized confidential nature by virtue of the relationship between Defendant and the person with whom he was communicating at the time of the surveillance (e.g. conversations between defendants and their attorneys, licensed physicians, and religious advisers), our holding might be different.

B.  Federal and State Wiretapping Statutes

Defendant also argues the recording of his conversation with his mother violated Title III of the Omnibus Crime and Control and Safe Streets Act of 1968 (Title III), as well as the Tennessee Wiretapping and Electronic Surveillance Act, both of which prohibit the unauthorized interception and disclosure of oral communications.  See 18 U.S.C. § 2511(1)(a); Tenn. Code Ann. § 40-6-301 et seq. "Oral communications" is defined in the federal statute as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication;" 18 U.S.C. § 2510(2).  Our state statute is essentially identical.  See Tenn. Code Ann. § 40-6-303(14).  The definition of "oral communication" has been interpreted to include the reasonable expectation of privacy standard used for Fourth Amendment purposes.  See United States v. Hall,

488 F.2d 193, 196 (9th Cir. 1973); S. Rep. No. 1097, 90th Cong. 2d Sess., reprinted in 1968 U.S. Code Cong. & Admin. News 2178 (the definition was intended to be interpreted in accordance with the principles enunciated in Katz). In other words, we should use the same standard for determining the protection of the wiretap laws as is employed in Fourth Amendment cases. Therefore, as we did in the case of the Fourth Amendment claim above, we also conclude that Defendant was not entitled to the protection of the federal and state wiretap laws. This issue is without merit.

## II. Miranda

### (Defendant's Issue III.)

Defendant argues that the statements should have been suppressed because he was not advised of his Miranda warnings even though he was allegedly in custody when he made incriminating statements. In reviewing this issue, we are again mindful that an appellate court must uphold a trial court's finding of fact in a suppression hearing unless the evidence in the record preponderates against those findings. Odom, 928 S.W.2d at 23.

In Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630, 16 L. Ed. 2d 694 (1966), the United States Supreme Court ruled that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires police officers, before initiating questioning, to advise the putative defendant of his right to remain silent and his right to counsel. Specifically, Miranda requires police to inform the person being questioned that (a) he has the right to remain silent; (b) any statement made may be used as evidence against him; (c) he has the right to the presence of an attorney; and (d) if he cannot afford an attorney, one will be

appointed for him prior to questioning, if he so desires. 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d 694. If these warnings are not given, statements elicited from the individual may not be admitted for certain purposes in a criminal trial. Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528, 128 L. Ed. 2d 293 (1994).

However, an officer's obligation to administer Miranda warnings only attaches "where there has been such a restriction on a person's freedom as to render him 'in custody.'" Id. (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714 (1977)). In Miranda, the Court explained that a "custodial interrogation" refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S. Ct. at 1612.

Thus, when determining whether or not there was custodial interrogation, the initial inquiry is whether the suspect was "in custody." The trial court will be given a wide latitude of discretion in its decision, and that decision will not be overturned by this Court unless it appears there has been an abuse of the trial court's discretion and a violation of the appellant's rights. See State v. Smith, 868 S.W.2d 561, 570 (Tenn. 1993), cert. denied, 513 U.S. 960, 115 S. Ct. 417, 130 L. Ed. 2d 333 (1994); State v. Nakdimen, 735 S.W.2d 799, 802 (Tenn. Crim. App. 1987).

"The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323, 114 S. Ct. at 1529, 128 L. Ed. 2d 293. Specifically, the inquiry is "how a reasonable [person] in the suspect's position would have understood his situation," i.e., would he have felt that he was not free to leave and, thus, in custody. Berkemer v. McCarty, 468 U.S.

420, 442, 104 S. Ct. 3138, 3151, 82 L. Ed. 2d 317 (1984). See also Michigan v. Chesternut, 486 U.S. 567, 573, 108 S. Ct. 1975, 1979, 100 L. Ed. 2d 565 (1988); State v. Mosier, 888 S.W.2d 781, 784 (Tenn. Crim. App. 1994); State v. Furlough, 797 S.W.2d 631, 639 (Tenn. Crim. App. 1990).

The Tennessee Supreme Court has expressly adopted the objective analysis employed by the United State Supreme Court and rejected as irrelevant to the determination of custody any inquiry into the subjective beliefs of law enforcement officials about the culpability or guilt of the person being questioned. State v. Anderson, 937 S.W.2d 851 (Tenn. 1996). The court adopted several nonexclusive factors to aid in the objective assessment of whether a reasonable person would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest. Relevant factors include the following:

> (1) the time and location of the interrogation; (2) the duration and character of the questioning; (3) the officer's tone of voice and general demeanor; (4) the method of transportation to the place of questioning; (5) the number of police officers present; (6) limitations on movement or other forms of restraint imposed during the interrogation; (7) interactions between the officer and the person being questioned, including the words spoken by the officer and the verbal or nonverbal responses of the person being questioned; (8) the extent to which the person being questioned is confronted with the officer's suspicions of guilt or evidence of guilt; and finally (9) the extent to which the person being questioned is aware that he or she is free to refrain from answering questions or to end the interview at will.

Anderson, 937 S.W.2d at 855. Although Miranda says the type of interrogation prohibited must be initiated by a law enforcement official, Anderson, 937 S.W.2d at 853, the term "interrogation" for Miranda purposes refers to "[N]ot only express questioning, but also to any words or actions on the part of the police (other than

-30-

those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689, 64 L. Ed. 2d 297 (1980).

It should be noted that the fact that an interview takes place at a police station or that the environment is perceived to be "coercive" is not determinative of the custody issue. For example, in Oregon v. Mathiason, the Court noted the following:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.

429 U.S. at 495, 97 S. Ct. at 714.

We should mention that our review of this issue is aided by the fact that Defendant's statements are in the record as audio visual tape recordings. Considering the totality of the circumstances, including the factors delineated in Anderson, the evidence in the record does not preponderate against the lower court's finding that Defendant was not in custody when he was interviewed by law enforcement officials. In this case there were actually a series of interviews. The first one began at approximately 5 p.m. and it took place in a 12 x 12 foot room marked "Felony Booking Room" at the Murfreesboro Police Department. The officers had initiated contact with Defendant, but Defendant voluntarily agreed to

come to the station with his family to clear up discrepancies the officers had found in Defendant's story about what happened. The officers talked with Defendant for 3 ½ - 4 hours after which time Defendant was formally arrested. At times, the officers questioned Defendant alone in the room, at times certain family members and the officers were present, and at times, it was just Defendant and one or both of his parents present. The police did vigorously question Defendant and at certain times even accused Defendant of not telling the truth or at least not telling the whole story. Specifically, the officers told Defendant "it's time to tell the truth," "you know who killed him," and "your story doesn't hold water." The officers even told Defendant's mother, in the presence of Defendant, that they knew Defendant had killed the victim. However, even though the officers were extremely inquisitive and often times accusatory, their demeanor was always polite and courteous towards Defendant. In fact, during the interview Defendant told his mother that the officers were being nice to him and that they were not intimidating him. Defendant is reminded throughout the interview that he is not under arrest and is free to leave at any time. However, on at least three occasions, Defendant mentioned that he would like to come back the following Monday and talk to the officers when his parents are not with him. On each occasion, it appears that the officers either changed the subject or kept pressing him to tell the truth. Nonetheless, until near the end of the interview when Defendant indicated that he thought he could go home and the officers advised him that he would be arrested that night, there is no evidence in the record that Defendant tried to leave the room and that the officers refused.

In consideration of all the foregoing, we cannot say that Defendant was subject to custodial interrogation. Although there are certainly some factors which point towards custodial interrogation, the evidence as a whole in the record simply

does not preponderate against the trial court's determination that Defendant was not in custody during the interview. Therefore, this issue is without merit.

### III. Voluntariness

(Defendant's Issue II.)

In addition to his argument in the preceding issue that he was subject to custodial interrogation, Defendant also contends that his statements were not voluntarily given. Specifically, Defendant argues that all of his statements should have been suppressed, or at least the statements made to his mother and father, because they were not voluntarily given. In denying Defendant's motion to suppress, the trial court simply stated that Defendant's statements were "certainly voluntary" but did not further address this issue or make any detailed findings of fact as to why the statements were in fact voluntary.

Along with the principles discussed in Issue II, the United States Supreme Court has also interpreted the Fifth Amendment to require that an incriminating statement or confession be freely and voluntarily given in order to be admissible. This even applies to statements obtained after the proper Miranda warnings have been issued. See State v. Kelly, 603 S.W.2d 726 (Tenn. 1980). Statements and confessions not made as a result of custodial interrogations must also be voluntary to be admissible. See Arizona v. Fulimante, 499 U.S. 279, 286-88, 111 S. Ct. 1246, 1252-53, 113 L. Ed. 2d 302 (1991). It must not be extracted by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Bram v. United States, 168 U.S. 532, 542-43, 18 S. Ct. 183, 187, 42 L. Ed. 568 (1897) (citation omitted). Moreover, due

-33-

process requires that confessions tendered in response to either physical or psychological coercion be suppressed. Rogers. v. Richmond, 365 U.S. 534, 540-41, 81 S. Ct. 735, 739, 5 L. Ed. 2d 760 (1961); Kelly, 603 S.W.2d at 728-29. This has evolved into the "totality of circumstances" test to determine whether a confession is voluntary. Fulimante, 499 U.S. at 285-87, 111 S. Ct at 1251-52; State v. Crump, 834 S.W.2d 265, 271 (Tenn.), cert. denied, 506 U.S. 905, 113 S. Ct. 298, 121 L. Ed. 2d 221 (1992).

The voluntariness test under the Tennessee Constitution has been said to be more protective of individual rights than the test under the United States Constitution. See State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). For the relinquishment of rights to be effective, Defendant must have personal awareness of both the nature of the right and the consequences of abandoning his rights. See id. at 544-45. Additionally, his statements cannot be the result of intimidation, coercion or deception. Id. at 544. In determining whether the statements were voluntary, the reviewing court looks at the totality of the circumstances surrounding the relinquishment of the right. Id. at 545.

The trial court found that the statements were made voluntarily. We have studied the evidence, considering the totality of the circumstances, and we cannot conclude that the trial court erred by denying Defendant's motion to suppress on this issue. The court's determination that the statements were given knowingly and voluntarily is binding upon the appellate courts unless the defendant establishes that the evidence in the record preponderates against the trial court's ruling. Odom, 928 S.W.2d at 23. There is no sufficient basis for holding that the alleged admissions were not free and voluntary simply because the Defendant was unaware, at the time

of the conversations, that he was being recorded. Deception itself does not render statements inadmissible where the deception is not of the type reasonably likely to procure an untrue statement. See R.K. Procunier v. Atchely, 400 U.S. 446, 448-49, 91 S. Ct. 485, 487, 27 L. Ed. 2d 524 (1971). Therefore, Defendant has failed to meet his burden of demonstrating that the evidence preponderates against the trial court's holding. Although the atmosphere surrounding the interrogation may have proved distressing to this 18-year-old man, there is little evidence to support that the statement was coerced or in any way involuntarily given. This issue is without merit.

<h3 style="text-align:center">IV. Fifth Amendment Right to Counsel</h3>

Defendant argues that his videotaped statements should have been suppressed because they were obtained in violation of his Fifth Amendment right to counsel. Defendant asserts that he expressed a desire to have counsel present, and that the officers should have ceased all questioning or should have limited their questioning to a clarification of whether he desired to have an attorney.

First of all we will mention that the Fifth Amendment provides the right to counsel at any police-initiated custodial interrogation. See, e.g., Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981); State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996); State v. Bates, 804 S.W.2d 868 (Tenn. 1991). Only the suspect can assert his right to counsel. See Huddleston, 924 S.W.2d at 669-70 (citing Davis v. United States, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). However, as discussed at length in Issue II, Defendant was not subject to custodial interrogation and therefore the officers were under no obligation to issue Miranda warnings.

At some point after Defendant confessed to the murder, the officers did tell Defendant to read a sheet of paper containing the <u>Miranda</u> warnings. When he finished reading them, Defendant refused to sign the waiver, but he told the officers that he did understand the warnings. Soon after he read the warnings, the officers asked Defendant, "Reckon we can find the billfold," to which Defendant responded, "I can help you find it, the keys too." Defendant had not requested a lawyer at this point, so these statements are admissible.

Defendant did eventually tell the officers that he wanted a lawyer. Specifically, he said, "get a lawyer, that would probably be the best thing . . . get lawyer." He went on to say that he was "waiting on a lawyer." Once Defendant had unequivocally requested an attorney, the officers were required to cease further questioning of Defendant. <u>See</u> <u>Edwards v. Arizona</u>, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981); <u>State v. Huddleston</u>, 924 S.W.2d 666 (Tenn. 1996). However, after carefully reviewing the transcript of the tapes and the tapes themselves, we are of the opinion that any incriminating statement Defendant made after asserting his Fifth Amendment right was in response to questions by his mother, not the officers. The following conversation ensued between Defendant and Mrs. Munn after he expressed a desire for an attorney:

> Mrs. Munn: Rudy are you sorry?
>
> Defendant: Not really.
>
> Mrs. Munn: Why?
>
> Defendant: He was a dirty little son of a bitch, looked at porno magazines, . . which is why . .
>
> Mrs. Munn: Why would you want to kill him, did he do something to you?

Defendant: . . . other than he was a jerk.

The type of interrogation prohibited by Miranda must be initiated by a law enforcement official. Anderson, 937 S.W.2d at 853. Since the incriminating statements were made in response to his mother's questions, those statements are admissible. The trial court made no finding of fact that Mrs. Munn was acting as an "agent" or an "extension" of the officers. Likewise, we do no find any objective evidence in the record that the officers were using the mother to elicit further information from Defendant. Defendant has made no showing that his mother acted at the behest of the officers or any other State agent.

Furthermore, any error in the admission of Defendant's statements after stating he wanted a lawyer was, at most, harmless beyond a reasonable doubt. Tenn. R. App. P. 36(b). Proof of guilt was overwhelming, and the foregoing statements were merely cumulative to other admissible evidence which clearly established guilt. See Hartman v. State, 896 S.W.2d 94 (Tenn. 1995).

## V. Derivative Evidence Rule

Defendant argues that the admissibility of his taped confession to his mother violated his constitutional rights, and that any subsequent confession is also tainted. Since we have ruled that Defendant's confession of the murder to his mother did not violate any of his constitutional rights, the derivative evidence rule, or "fruit of the poisonous tree" rule, is wholly inapplicable. See State v. Underwood, 669 S.W.2d 700 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 1984). This issue is without merit.

## VI.  Sufficiency of the Evidence


Defendant argues that the evidence is insufficient to support the jury's guilty verdict of first degree murder.  When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosection, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  This standard is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).


Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court.  State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 1987).  Nor may this court reweigh or reevaluate the evidence.  Cabbage, 571 S.W.2d at 835.  A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State.  Grace, 493 S.W.2d at 476.

All homicides are presumed to be murder in the second degree. State v. West, 844 S.W.2d 144, 147 (Tenn. 1992); State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). That State bears the burden to prove premeditation in order to elevate the offense to murder in the first degree. West, 844 S.W.2d at 147.

At the time the offense was committed, first degree murder not committed in the perpetration of one of several specifically enumerated crimes required the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A premeditated act is one "done after the exercise of reflection and judgment" and requires a previously formed design or intent to kill. Tenn. Code Ann. § 39-13-202(d); West, 844 S.W.2d at 147. The element of premeditation is a question for the jury and may be inferred from the manner and circumstances of the killing. State v. Bordis, 905 S.W.2d 214, 221 (Tenn. Crim. App. ), perm. to appeal denied (Tenn. 1995); State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993), perm. to appeal denied (Tenn. 1994).

In the present case, Defendant clearly planned the murder, procured a weapon, lured the victim to the Day's Inn, and caused the victim to position himself so that Defendant could deliver a single shot to the back of his head. Following the murder, Defendant hid the victim's vehicle and then attempted to mislead the police during their investigation. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) (citation omitted) (evidence of use of deadly weapon on unarmed victim, preparations prior to killing for purposes of concealment, and cruelty of killing are relevant circumstances in establishing premeditation). As mentioned earlier in this

opinion, Defendant offered the following detailed statements showing a "premeditated and intentional killing" of the victim:

> Well, we had to go somewhere else. I told him we were going to go ___ and meet somebody but he ___ the license plates on the car, so if we did get caught it would be hard to find when we did that, when he knelt down to unscrew the license plate. Then I shot him in the back of his head. He fell down and I rolled him over and took his license and wallet.

> . . .

> Ron Munn: You shot him?

> Defendant: Yes.

> Ron Munn: Why'd you do it?

> Defendant: For money.

> Ron Munn: For what?

> Defendant: For money. I hate it that I had to ask you for money, never enough.

> Ron Munn: Rudy.

> Defendant: Plus, I hated the kid -- he was a jack-ass.

> Ron Munn: Rudy.

> . . .

> It was intentional. I did it on purpose. I knew exactly what I was gonna to do. I knew what to take to take his identification. I wish I could have put his car somewhere else but Abernathy was the farthest away from Sharp that there was, that I could think of, without having to walk too far. That's why I put it over there.

Furthermore, Defendant confessed to the murder, and we have previously found that confession to be admissible. Even absent the confession, there is still certainly sufficient circumstantial evidence from which the jury could find that

Defendant had a "previously formed design or intent to kill." <u>West</u>, 844 S.W.2d at 147.  This issue is without merit.

## VII.  Mistrial

In this issue, Defendant argues that certain comments made by Detective Guthrie should have resulted in a mistrial.  Specifically, Detective Guthrie testified during direct examination to the following:

> Q: (General Newman) Now, I believe that there has been prepared and you have helped in preparing a transcript of this particular interview; is that correct?
>
> A: (Detective Guthrie) Yes, sir.
>
> Q: (General Newman) And what is the significance of the blank portions of that interview or the blank spaces: What does that indicate?
>
> A: (Detective Guthrie) Certain things were left out that would be damaging to the defense.

Following this exchange, defense counsel objected and moved for a mistrial.  The blank spaces in the transcript and on the tape were there because the parties could not agree as to what was being said during that particular portion of the videotape.  The judge ruled that the transcript would not be submitted to the jury and then gave the following curative instruction:

> Ladies and Gentlemen, the videotapes or tapes you are about to view this morning have been edited to delete portions thereof which were deemed by the court to be either irrelevant or immaterial to this particular case.  So don't concern yourselves with -- you'll see some jumps and there may be some blank spots.  Don't concern yourself with those.  There is nothing in there that you should hear.

Whether an occurrence during the course of a trial warrants the entry of a mistrial is a matter which addresses itself to the sound discretion of the trial court, and this Court will not interfere with the exercise of that discretion absent clear abuse. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994), perm. to appeal denied (Tenn. 1994). The burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). In making this determination, no abstract formula should be mechanically applied, and all circumstances should be taken into account. State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993).

It is well-established that jurors are presumed to follow the instructions given by the trial judge. See State v. Laney, 654 S.W.2d 383, 389 (Tenn. 1983); State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985). Based on the adequacy of the trial court's instruction and Defendant's failure to demonstrate prejudice, we cannot say that the statement by Detective Guthrie "more probably than not affected the judgment" in this case. Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). Thus, the trial court did not abuse its discretion in denying Defendant's motion for a mistrial as the statement did not create a manifest necessity for a mistrial. Any error was harmless. Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

## VIII. Aggravating Circumstance (i)(7)

Defendant argues in this issue that there is an insufficient nexus between the murder and the underlying felony, thus making aggravating circumstance (i)(7) inapplicable.

The jury found that the "murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any . . . robbery . . . [or] theft." Tenn. Code Ann. § 39-13-204(i)(7).

In support of his argument that the nexus between the murder and the underlying felony is insufficient, Defendant relies on State v. Terry, 813 S.W.2d 420 (Tenn. 1991). In Terry, the defendant was a preacher whom had embezzled substantial sums of money from his congregation over a period of time. He began stealing the money in March of 1987, and in June of 1987 the defendant killed the church handyman, placed him in the church building, and then torched the building in hopes that authorities would think that it was defendant's body that would be found in the ruins. Id. at 421. In sentencing the defendant to death for this offense, the jury applied the felony murder aggravating circumstance on the basis of the underlying larceny. Id. At the motion for new trial hearing, the trial judge granted the defendant a new sentencing hearing. The judge found that the jury was warranted in finding that a larceny had occurred, but he also found that the State did not prove that the murder was committed while the defendant was engaged in the commission of the larceny. Id. at 422. The Tennessee Supreme Court agreed with the trial judge that there was an insufficient nexus between the murder and the larceny. Id. at 424. In so holding, our supreme court stated that application of the felony murder aggravating circumstance depends upon the "temporal, spatial and motivational relationships between the capital murder and the collateral felony." Id. at 423 (quoting 67 A.L.R.4th 887, 892 (1989)).

Applying those factors to the circumstances of this case, it is clear that Defendant's argument is without merit. Here, the murder and the collateral felony occurred at the same time and in the same place. The victim was discovered with his pants pockets turned inside out. Defendant confessed numerous times that he killed the victim because of money. Furthermore, he told the officers that he could help them in finding the victim's wallet. Based on the physical evidence as well as Defendant's own admission, we conclude that the evidence is sufficient to support the jury's findings as to aggravating circumstance (i)(7).

## IX.  Jury Charge

Defendant argues in this issue that the trial court committed reversible error as a result of several jury instructions prior to the jury's deliberation concerning sentencing.

### A.  Aggravating Circumstances

The jury was instructed on two aggravating circumstances: (1) the murder was committed in order to avoid lawful arrest and (2) the murder was committed during the course of a felony. <u>See</u> Tenn. Code Ann. § 39-13-204(i)(6) and (7). However, the jury only found Defendant had committed the murder during the course of a felony. It did not find that he had committed the murder in order to avoid lawful arrest. Defendant nevertheless argues that neither aggravating circumstance is applicable to this case and that instructing the jury on two aggravators resulted in great prejudice.

First, as discussed in the previous issue, the jury was presented with ample evidence in support of the aggravating circumstance that the murder was committed during the course of a felony. See Tenn. Code Ann. § 39-13-204(i)(7). Second, Defendant has not shown how instructing on the murder to avoid lawful arrest prejudiced him in any way. See Tenn. Code Ann. § 39-13-204(i)(6). Although we may agree that aggravating circumstance (i)(6) was inapplicable to the facts of this case, we find no prejudice and any error in charging this was harmless. Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

B. Statutory Definition of Theft and Robbery

Defendant argues that the trial court erred by failing to instruct the jury on the statutory definitions of theft and robbery. Specifically, Defendant argues that the trial court's use of T.P.I. Criminal 9.01 and 11.01 in charging the definitions of these offenses was confusing to the jury.

The supreme court has held that a trial court is required to provide the jury with the statutory definition of any felony relied upon by the State as an aggravating circumstance under Tenn. Code Ann. § 39-13-204(i)(7). State v. Nichols, 877 S.W.2d 722, 735 (Tenn. 1994); State v. Hines, 758 S.W.2d 515, 521-24 (Tenn. 1988). Furthermore, pattern jury instructions are not officially approved by this Court or by the General Assembly and should be used only after careful analysis. They are merely patterns or suggestions. While previously printed forms may be convenient, they must be revised or supplemented if necessary in order to fully and accurately conform to applicable law. See State v. Hodges, 944 S.W.2d 345, 354 (Tenn. 1997).

After a careful review of the pattern instructions charged by the trial court and the statutory definitions of theft and robbery, we find that the definitions are very similar, albeit the pattern instructions are lengthier and more specific. However, we find no significant difference between the statutory definitions and the pattern instructions and therefore, any error in not charging the statutory definitions of theft and robbery is harmless. Tenn. R. App. 36(b); Tenn. R. Crim. P. 52(a).

C.  Nonstatutory Mitigating Factor

Next, Defendant argues that the trial court erred by refusing to instruct the jury that he had "no criminal record or conviction." We emphasize at the outset that this alleged error is not of constitutional magnitude, as jury instructions on specific non-statutory mitigating circumstances are not constitutionally mandated. See Hodges, 944 S.W.2d at 351-52; Odom, 928 S.W.2d at 30; State v. Hutchison, 898 S.W.2d 161, 173-74 (Tenn. 1994). Therefore, the right to such instructions, as well as the form and content of the instructions, derives solely from the statute.

The court charged the jury with the statutory mitigating factor which states that "defendant has no significant history of prior criminal activity." Tenn. Code Ann. § 39-13-204(j)(1). However, Defendant urged the trial court to charge the jury that Defendant had "no criminal record or conviction." In Odom, which was decided some six months before the instant case went to trial, the supreme court interpreted Tenn. Code Ann. § 39-13-204(e)(1) to require jury instructions on non-statutory mitigating circumstances raised by the evidence and proffered by a defendant as having mitigating value. In addition, the court stated that instructing on nonstatutory mitigating circumstances must not be fact specific and imply to the jury that the judge

had made a finding of fact. Instead, the instructions on nonstatutory mitigating circumstances must be "drafted so that when they are considered by the jury, the statutory mitigating circumstances are indistinguishable from the nonstatutory mitigating circumstances." Odom, 928 S.W.2d at 32. The supreme court further interpreted the "no distinction" portion of the statute as precluding the trial judge from revealing to the jury that a request was made and from identifying the party making the request. Id.

Defendant does not specifically state why the mitigating factor proposed by him should have been included. We do not believe that the instruction offered by the court that the "defendant has no significant history of prior criminal activity" failed to convey Defendant's theory of mitigation to the jury. We find very little difference between the two instructions. Furthermore, had the trial judge offered Defendant's fact-specific instruction, it could have implied to the jury that the judge had made a finding of fact in contravention of Article VI, § 9 of the Tennessee Constitution. Odom, 928 S.W.2d at 32. Though not explicitly stated in Odom, the clear implication is that instructions on nonstatutory mitigating circumstances must be phrased in general categories similar to the statutory mitigating circumstances. In this case, the trial court offered the more generalized instruction to the jury to conform to the evidence and the law. See id. The statutory mitigating factor charged was not as specific as Defendant's special request. However, the instruction given by the trial court generally encompassed the subject contained within the special request. Therefore, we conclude that the trial court's refusal to charge the jury on the nonstatutory mitigating circumstance did not constitute error.

D. Request for Modified T.P.I. Instruction

Defendant asserts that the trial court committed error when it refused to charge Tennessee Pattern Jury Instruction 43.03 during the sentencing phase of trial. That instruction addresses the situation where the defendant refuses to testify during the guilt phase of trial. It states:

> The defendant has not taken the stand to testify as a witness but you shall place no significance on this fact. The defendant is presumed innocent and the burden is on the state to prove his guilt beyond a reasonable doubt. He is not required to take the stand in his own behalf and his election not to do so cannot be considered for any purpose against him, nor can any inference be drawn from such fact.

T.P.I. 43.03.

The jury in this case was given this instruction during the guilt phase of trial. Defendant's concern at the sentencing hearing was that the jury should be instructed that the burden is upon the State to prove aggravating circumstances. In response to his concern, the trial court correctly advised Defendant that the pattern instruction for sentencing for life imprisonment or life imprisonment without the possibility for parole addressed this concern. That instruction included the following language:

> The burden of proof is upon the state to prove any statutory aggravating circumstance or circumstances beyond a reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case.

See T.P.I. 7.04(a).

In light of the foregoing instruction, we find Defendant's request to be unwarranted. Defendant wanted the jury to know that the State had the burden of proof as to the aggravating circumstances, and we find that the instruction given accomplished that purpose. Any error in not charging T.P.I. 43.03 was harmless and does not constitute reversible error.

## X.  Admissibility of Certain Testimony

Defendant argues that the trial court committed error by permitting certain testimony at the sentencing hearing.  First, he argues that the testimony of Valerie Roscoe, the victim's fiancee, was irrelevant and inadmissible under Tenn. R. Evid. 403.  Ms. Roscoe testified concerning her wedding plans with the victim and the fact that she intended to convert to Catholicism.  Defendant objected to Ms. Roscoe's testimony and the trial court overruled it on the ground that her relationship with the victim was in fact material.  Secondly, Defendant asserts that the trial court abused its discretion by allowing the State to call Officer Peel as a rebuttal witness concerning Defendant's statements regarding his prior criminal activity.  The State offered the testimony of Peel in order to demonstrate to the jury that Defendant stated that he had prior criminal activity and to clarify or correct what the defense had characterized as a statement merely being attributed to him.  The trial court found the officer's testimony to be in rebuttal and not beyond the scope of Defendant's proof.

Defendant has not shown how the testimony of Ms. Roscoe or Officer Peel prejudiced him.  Although we find the relevancy of parts of Ms. Roscoe's testimony

to be questionable, any error in admitting the testimony would be harmless. Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). Therefore, we find no merit to this issue.

XI. Jury Instruction to "Continue Deliberations"

During deliberations following the sentencing hearing, the jury twice sought guidance from the judge. In the first instance, the jury sent two questions to the judge. First, the jury wanted to know "Can the 51 years sentence [for life imprisonment] ever be changed by statute," and secondly "What happens if the Jury cannot come to a unanimous decision?" In response to those questions, the judge simply replied that he could not answer those questions. A few minutes later, the jury sent a statement to the judge informing him that they could all agree on the aggravating circumstances, but that they could not reach a decision as to the sentence to impose. The judge sent a written response instructing them to "continue deliberations per earlier instructions."

Defendant argues that the trial court failed to follow the guidelines set forth in Kersey v. State, 525 S.W.2d 139 (Tenn. 1975) and in Section 5.4 of the ABA Standards Relating to Trial by Jury by directing the jury to "continue deliberations." Defendant argues that the statement essentially coerced the jury into returning the verdict. Specifically, the Kersey court formulated the following instructions a judge should issue when faced with a deadlocked jury:

> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.
>
> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment.
> Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own view and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Kersey, 525 S.W.2d at 145. The court also noted that the charge may be given only in the form specified in that opinion, and then, only when it was given as part of the main charge. "Strict adherence is expected and variations will not be permissible." Id. at 145.

As to the first set of questions sent to the judge by the jury, we find that the questions alone are insufficient to show that the jury was deadlocked. The jury simply asked if the verdict had to be unanimous; it did not actually say that they were deadlocked. Therefore, we find that the dictates of Kersey do not apply.

As to the judge's response to the second question sent to him, "continue deliberations per earlier instructions," we find that the comment was not directed to jurors in the minority, nor did it urge such jurors to reevaluate or to cede their views to those of the majority. Similarly, the court did not impose a deadline on the jury for its deliberation. We find that the case is similar to State v. Baxter, 938 S.W.2d 697, 703 (Tenn. Crim. App. 1996), perm. to appeal denied (Tenn. 1997), in which the judge told the jury, "I'm going to have you continue to deliberate." See also State v.

Dick, 872 S.W.2d 938, 946 (Tenn. Crim. App. 1993). As in Baxter, we do not view the trial court's comments as requiring a reversal of the conviction. An error in the charge to the jury is not grounds for reversal unless it affirmatively appears that the error has affected the results of the trial. Tenn. R. App. P. 36(b); Vanderbilt University v. Steely, 566 S.W.2d 853, 854 (Tenn. 1978). The remarks by the court were not an "undue intrusion . . . into this exclusive province of the jury . . . ." Kersey, 525 S.W.2d at 144; see also State v. Goad, 707 S.W.2d 846, 851 (Tenn. 1986); Bass v. Barksdale, 671 S.W.2d 476 (Tenn. App. 1984) (adopting Kersey and noting that "[n]othing should be done or said to a juror which can in any manner be taken by that juror to indicate that he or she should abandon an honestly held conviction in order to reach a verdict . . . ."). Therefore, Defendant is not entitled to relief on this ground.

## XII.  Viewing of Video Taped Confession in Jury Room

In this issue, Defendant contends that the trial court abused its discretion by permitting the jury to view the video tape of his confession during the deliberations following the sentencing phase of the trial. Rule 30.1 provides as follows:

> **Jury Examination of Exhibits** -- Upon retiring to consider its verdict, the jury *shall* take to the jury room all exhibits and writings which have been received in evidence, except depositions, for their examination during deliberations, *unless* the court, for *good cause*, determines that an exhibit should not be taken to the jury room.

Tenn. R. Crim. P. 30.1 (emphasis added). First, it is well established that a jury in a bifurcated trial may rely upon the evidence presented during the guilt phase of trial. See Tenn. Code Ann. § 39-13-204(e); State v. Teague, 897 S.W.2d 248, 250-51 (Tenn. 1995). Therefore, contrary to Defendant's assertion, it is irrelevant that the

State did not introduce the videotape as evidence during the sentencing hearing. Defendant also argues that the tape should have been excluded because it was made in violation of his federal and state constitutional rights as discussed previously in this opinion. Tenn. Code Ann. § 39-13-204(c) states that "introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee" is not authorized. However, as we determined in Issues I-IV, introduction of the tape was not a violation of any of Defendant's constitutional rights. We can find no "good cause" reason as to why the videotape should not have been taken to the jury room. Therefore, this issue is without merit.

## Conclusion

After a careful review of the entire record, including the transcripts, exhibits, video cassettes, and briefs, we respectfully affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, Judge

CONCUR:

_____
JOSEPH M. TIPTON, Judge

_____
JOE G. RILEY, Judge